## The Travelers' Insurance Company v. Mary A. Ayers.
### Gen. No. 11,859.

1. ACCIDENT INSURANCE POLICY—*when does not exclude death from involuntary asphyxiation.* Such a policy, which provides, among other things, that the company shall not be liable in the event of death "from any gas or vapour or poison," does not exclude liability where death results from involuntary asphyxiation.

2. INSURANCE POLICY—*how construed.* A policy of insurance must be construed strictly as against the company which prepared it, and liberally in favor of the insured; and if the language is doubtful, the construction must be in favor of the insured.

3. INSTRUCTION—*must not be contrary to the uncontradicted evidence in the cause.* An instruction is erroneous which is contrary to the uncontradicted evidence in the cause.

4. INSTRUCTION—*must not relate to matters of defense not relied upon in the pleadings.* An instruction predicated upon special matters of defense not relied upon in the pleadings, is properly refused.

Action of assumpsit. Appeal from the Superior Court of Cook County; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed March 27, 1905.

**Statement by the Court.** The appellant insured against injuries to the person, fatal or otherwise, caused by "external, violent and accidental means." March 15, 1898, appellant issued a policy to John C. Ayers, a traveling salesman, for the term of three months from noon of March 15, 1898, in the sum of $4,000, to be paid to Mary A. Ayers, his wife, or, in case of her death, to his executors, administrators or assigns, in the event that, within ninety days, the death of

the insured should result from injury such as described in the policy.

The policy contains the following:

"This insurance shall not cover injuries of which there is no visible mark on the body, the body itself, in case of death, not to be deemed such mark; nor disappearance; nor suicide, sane or insane; nor accident, nor injuries, nor disability, nor death, nor loss of limb or sight, resulting wholly or partly, directly or indirectly, from voluntary over exertion, or voluntary exposure to unnecessary dangers, from intoxication or while intoxicated, from or while violating law, from hernia, from disease, from medical or surgical treatment, except amputation necessitated solely by injuries and made within ninety days after accident, from fits, vertigo, sleep-walking, *from any gas or vapor or poison,*" etc.

The declaration is in the usual form, and avers, among other things, that "John C. Ayers, without any wrong, fault, or procurement on his part, accidentally sustained bodily injury, by involuntarily and unconsciously breathing the atmosphere of the room full of illuminating gas, while asleep in bed at a hotel, and, as the result alone of such injury, the said John C. Ayers came to his death through external, violent and accidental means, within ninety days after the infliction of the injuries aforesaid, to-wit: on the 10th day of November, 1900; that, during all the time the said John C. Ayers was insured under said policy, he was, by occupation, a traveling salesman and actively engaged in such business at the time of his death."

Appellant pleaded five pleas: first, the general issue; second, that the death of the assured was caused by reason of his intoxication, and while he was intoxicated; third, that the death of the assured was caused by the inhalation of a poisonous illuminating gas, caused by the opening and leaving open by him of a stop-cock of the pipe conducting said gas into the room that he occupied; fourth, that the death of the assured was caused by suicide, from wilfully and intentionally inhaling poisonous illuminating gas; fifth, or

additional plea, that the death of the insured, John C. Ayers, was caused by injuries arising and resulting from gas. A similiter was filed to the first plea and a replication to each of the others. The jury found for appellee and assessed her damages at the sum of $4,572.24. Motions for a new trial and in arrest of judgment were overruled, and judgment was entered on the verdict.

The facts are substantially as follows: John C. Ayers registered at the Arnold Hotel, in Richmond, Indiana, Wednesday of the week in which he died, and was assigned to room number 5. He was found in his bed in that room between ten and twelve o'clock in the morning of Saturday, November 10, 1900, breathing, but nearly dead. A physician, Dr. Watts, was immediately telephoned for, but when he arrived, which he testified was between ten and eleven o'clock, John C. Ayers was dead. Persons who entered the room, at the time the insured was found, as stated, testified that there was in the room an odor of gas. Mr. Worral, one of the proprietors of the hotel, testified that the odor was strong. The room, prior to Saturday morning, had been lighted by natural gas. Mr. Worral testified that in the morning of the death of the assured, he sent for Mr. Horton of the gas office, to make changes or repairs in respect to the gas in the hotel, and that Horton came between seven and eight o'clock in the morning. Q. "What did he do?" A. "I was not down in the cellar. I suppose he changed the artificial gas into the meter and took out the natural gas. He cut off the natural gas and adjusted the pipes and fixed the meter, and after that turned on the artificial gas. I suppose he did that. He was so ordered." Q. "He notified you of the change?" A. "Yes." Q. "Some time between that and noon?" A. "Yes."

Edward E. Williams, who worked at the hotel and was one of those who entered room 5 about the time the condition of the insured was discovered, testified that he heard Horton tell Mr. Worral, about ten o'clock of the morning of the death, "Now I have changed the gas, and I have turned on the artificial gas."

Harry R. Green, son-in-law of the assured, testified: "He died November 10, 1900, in Richmond, Indiana. I saw him the following day. He died at the Arnold Hotel. The room in which he died, to the best of my recollection, was about 12 x 14 feet square, with two doors and a window; one door leading from a hall into the room, another door leading into an adjoining room, and the window either to the outside or a court. The head of the bed was south, the foot north. Just north of the bed and to the left was the dressing case; between that and the door was the gas jet. The gas jet, I should judge, was eight feet from the head of the bed. I am not sure whether there was a transom in the room. There was an outside window. The gas jet worked very hard— the shut-off was hard to open and close. The room was on the second floor of the hotel."

A letter written by Mary A. Ayers, the appellee, to the appellant, dated November 14, 1900, was read in evidence by appellee's attorney, without objection, which contains the following: "From evidence gleaned by me, the facts are as follows: Mr. Ayers retired on Friday night, November 9th, at ten o'clock. He was in the habit of turning his gas low and sleeping with a light in his room. The Gas Company in Richmond made a change of meters, from natural gas to artificial gas, on Saturday morning, and, Mr. Ayers' light being aflame, he was not notified when the meter was taken out and the new meter of artificial gas substituted, which caused a flow of gas in his room, thereby killing him."

The finding of the coroner's inquest, put in evidence by appellee, is, in substance, that "The said deceased came to his death the 10th day of November, 1900, by apnoea, from the accidental inhalation of artificial gas, while a guest of the Arnold Hotel, Richmond, Indiana. There is nothing in the evidence to indicate that self destruction had been contemplated by the deceased."

HORTON & BROWN, for appellant.

JAMES JAY SHERIDAN and MONROE FULKERSON, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

We think it plain from the evidence that John C. Ayers,, the insured, came to his death by external, violent and accidental means, and counsel for appellant do not claim the contrary, but insist that liability is excluded by the terms of the policy. This, too, was the position of the appellant, when proofs of death were furnished to it, as appears from a letter written to appellee's attorney, by J. R. Lewis, adjuster for appellant, in which the following occurs: "Upon examination of said proofs, I find that the cause of death, as therein stated, is not covered by said policy, and the circumstances attending the alleged accidental death do not bring it within the provisions of the policy."

Counsel contend that the court erred in refusing to give the following instruction asked by appellant:

"The jury are instructed that the policy of insurance sued on in this case does not cover injuries of which there is no visible mark on the body, the body itself in case of death not to be deemed such mark, and, therefore, if you believe from the evidence that John C. Ayers, the person named in the policy of insurance sued on in this case, came to his death from injuries of which there was no visible mark on the body of said John C. Ayers, then you must find the issues, for the defendant."

The instruction was properly refused for three reasons: first, it consists of matter of defense and was not pleaded, and which, to be availed of, should be specially pleaded. 4 Joyce on Insurance, sec. 3691. Second, there is uncontradicted evidence that there were visible marks on the body, and the jury could not reasonably have found that there were not. Third, the provision in the policy as to visible mark on the body applies only to injuries not causing death in three months. Mallory v. Travelers Ins. Co., 47 N. Y. 52, 56; Paul v. Same, 112 id. 472, 477.

Dr. Watts, who saw the body of the insured immediately after his death, testified that he examined the body and found there was some froth oozing from the mouth, and that he

noticed on the chest, and also on the abdomen, red spots,, which, to his mind, were characteristic of the cause of death; that, having smelled the odor of gas in the room, and after he was told what the trouble was, he was convinced that the assured came to his death from gas asphyxiation and that he had every appearance of such a death.

Counsel for appellant next contend that death "by involuntary and unconsciously breathing the atmosphere of the room, full of illuminating gas, while asleep in bed at a hotel," is not within the policy, but is excluded therefrom by the provision in regard to death "from any gas or vapor, or poison,, or contact with poisonous substances." Formerly, the clause in relation to gas, etc., in appellant's policies, was "nor by the taking of poison, contact with poisonous substances, or inhaling of gas," etc., and in a suit on a policy which contained that clause, the New York Court of Appeals, in Paul v. Travelers Insurance Co., 112 N. Y., 472, held that the clause did not exclude liability of the company, in the case of an involuntary and unconscious inhalation of gas, but only in a case in which the inhalation was the voluntary and intelligent act of the assured.

In Healey v. Mutual Acc't Association, 133 Ill., 556, the court followed the New York case cited, in holding that death caused by the inhalation of gas was caused by external and violent means. Ib. 563.

In Travelers Ins. Co. v. Dunlap, 160 Ill. 643, the suit was on a policy which, in terms, excluded liability, in the case of the insured "taking poison." In the statement of the case by this court, which the Supreme Court apparently adopts, it is said: "The evidence tended to show that the deceased came to his death on June 14, 1890, as the result of taking, from his own hand, a considerable quantity of carbolic acid, in place of a medicine which he desired to take, for sickness from which he was suffering at the time." It was objected that the death caused by taking the carbolic acid, as stated, was not within, but was excluded from, the policy by the provision in respect to taking poison. The court say: "While the precise point here at issue was not

discussed in the opinion in the Healy case, yet it was involved in the decision, and is within the reasoning there employed," and the court held "that the term 'taking poison' would, in common parlance, be understood to mean an intelligent and conscious act." The court further say: "It must, however, be conceded that the meaning of the term in the respect mentioned is not free from doubt. Able and learned arguments have been made on each side of the question by counsel, and cases are cited showing that courts of high authority do not agree on the subject. It would therefore seem to be eminently proper, in such a case, to apply the well-known rule of construction applicable to such instruments, that where there is doubt or uncertainty as to the meaning of the terms employed, the language, being that of the insurer, must be liberally construed in favor of the insured, so as not to defeat, without a plain necessity, his claim to indemnity, which, in making the insurance, it was his object to secure. Niagara Fire Ins. Co. v. Scammon, 100 Ill. 644; Healey v. Mutual Accident Ass'n, *supra;* May on Insurance, sec. 175." The court cite with approval Paul v. Travellers Ins. Co., *supra.*

In Fidelity & Casualty Co. v. Waterman, 161 Ill. 632, the court, in its opinion, say: "The intestate was asphyxiated by illuminating gas in the Northern Hotel, at Aurora, Illinois, on the night of December 5, 1892. He was found dead in bed on the morning of December. 6th, and the room was full of gas." The policy contained a provision that it did not cover "injuries, fatal or otherwise, resulting from poison, or anything accidentally or otherwise taken, administered, absorbed or inhaled." The court, after citing the Dunlap, Healy and other cases, held that the death was within the policy. It will be observed that the policy in the case last cited excludes, in terms, injuries, fatal or otherwise, resulting from poison. By the use of the word "fatal," it excludes death resulting from poison. In the present case the exclusion is "death * * * resulting wholly or partly, directly or indirectly * * * from gas or vapor, or

poison." The object of applicants in applying for such policies as the present, is to secure indemnity against accidents, and, in construing such policies, this must be kept constantly in mind. Hence the court in Metropolitan Acc't Association v. Froiland, 161 Ill. 30, say: "Insurance contracts are to be liberally construed, so as not to defeat the indemnity, which, in making the contract, it was the object to secure, unless plainly necessary from the language of the contract." Similar language is used in the Dunlap case, *supra,* and in other cases. Appellant's counsel seek to exclude the case of Paul v. Travellers Ins. Co., *supra*, as authority in the present case, on account of the following language in the opinion in that case: "If the policy had said that it was not to extend to any death caused, wholly or in part, by gas, it would have expressed precisely what the appellant now says is meant by the present phrase, and there could have been no ground for doubt or mistake," and counsel say, in substance, that appellant's policies were changed to conform to this expression of the court in the Paul case. The statement of the court is hypothetical, and the conclusion is based on the hypothetical statement. The question was not before the court as to the effect of such language as the court suggested, if in the policy. Consequently the effect of the suggested language was not debated or argued, and we think it may well be presumed that the court did not consider the suggested language, or its effect if used, as carefully as if it had been in the policy and fully argued and considered. Appellant's counsel attempt to distinguish the Paul case and other like cases from the present, by the absence from the policy sued on of the word "inhaling," which has been held to imply a conscious, intelligent act. But counsel have not attempted to inform us how death can be produced by illuminating or other poisonous gas otherwise than by inhaling it, and we think it obvious that death could not be produced by such gas in any other way. True, one might be killed by an explosion of gas, but, in such case, it would be the shock of the explosion and not the gas which would kill. If, then, the

only way in which death can be produced by gas is by inhaling the gas, it follows that the word "inhaling" in the exclusion provision was unnecessary and would have been superfluous, and the meaning of the provision in the policy in question is the same as if the word "inhaling" were used in it. Inhalation can only take place in breathing, and breathing goes on involuntarily when one is asleep or unconscious.

The policy must be construed strictly as against the company, which prepared it, and liberally in favor of the insured, and if the language is doubtful, the construction must be in favor of the insured. Niagara Fire Ins. Co. v. Scammon, 100 Ill. 644, 649; Healey v. Mut. Acc't Ass'n, 133 ib. 556, 561; Travelers Ins. Co. v. Dunlap, 160 Ill. 642, 646; Forest City Ins. Co. v. Hardesty, 182 Ill. 39; 1 Joyce on Insurance, sections 21 and 22. Joyce also says: "The construction should be liberal rather than critical or technical, for technical constructions are not favored. The contract should be given effect, if possible, rather than made void, for only a stern legal necessity will warrant a construction which will nullify the policy." Ib., section 112. There can be no question that the language of the provision relied on by appellant might have been so framed as to exclude doubt of its meaning. In Cen. Mut. Life Ins. Ass'n v. Anderson, 195 Ill. 135, the life policy sued on contained these words: "This policy is void in case of death by suicide." Anderson, the insured, shot himself with a pistol, and the company contended that it was not liable. There was a recovery on the policy, and the court held: "If at the time of the shooting he was insane and his reasoning faculties were so impaired that he was not able to understand the moral character, the general nature, consequence and effect of the act he was about to commit, or if he was impelled thereto by an insane impulse which he did not have power to resist, then his act was not suicide, within the sense of the term as used in the application and policy of insurance." And the court also held that the question as to Anderson's mental condition was for the jury to decide. But in Seitzinger v. Modern Woodmen, 204 Ill. 58, the policy sued on pro-

vided that if a member should die by his own hand, sane or insane, his benefit certificate should, by reason thereof, become null and void, and the court held there could be no recovery on such policy when the insured died by his own hand. These cases serve to illustrate the possibility of the removal of doubt. What has been said includes all the contentions of appellant, relied on in argument, and all others must be deemed waived.

This is not a court of last resort, and in view of the decisions in the class of cases to which this belongs, including those cited, we do not feel warranted in interfering with the judgment of the trial court, while, were it not for such decisions, we would be inclined to hold that the phrase, "death from gas," includes the accidental and involuntary inhalation of gas.

The judgment will be affirmed.

*Affirmed.*